# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

FILED
AUG 13 2009
AUG 13 2009
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

DOUGLAS GREER

CASE NUMBER:

09CR 696

MAGISTRATE JUDGE MASON

I, Haralambos J. Kotsianis, the undersigned complainant being duly sworn, state the following is true and correct to the best of my knowledge and belief:

On or about August 12, 2009, at Chicago, in the Northern District of Illinois, defendant DOUGLAS GREER knowingly and intentionally possessed with intent to distribute and distributed a controlled substance, namely, 5 kilograms or more of mixtures and substances containing a detectable amount of cocaine, a Schedule II Narcotic Drug Controlled Substance;

All in violation of Title 21, United States Code, Section 841(a)(1).

I further state that I am a Drug Enforcement Administration Task Force Officer, and that this complaint is based on the following facts:

Please see attached affidavit.

Continued on the attached sheet and made a part hereof:   X  Yes  ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

August 13, 2009                         at   Chicago, Illinois
Date                                         City and State

Michael T. Mason, Magistrate Judge          _____
Name & Title of Judicial Officer            Signature of Judicial Officer

STATE OF ILLINOIS            )
                             )  SS
COUNTY OF COOK               )

## AFFIDAVIT

I, Haralambos J. Kotsianis, being first duly sworn, state the following:

**I.    PRELIMINARY INFORMATION**

1. I have been employed as a Task Force Officer since December of 2000 by the Crestwood Police Department and currently by the Palos Park Police Department. I am currently assigned to the DEA/High Intensity Drug Trafficking Area ("HIDTA") Task Force in Chicago, Illinois. During my employment as a Task Force Officer, I have been involved in the investigations and enforcement of the controlled substance laws. As a Task Force Officer, I have attended specialized training pertaining to drug interdiction and drug recognition.

2. I am responsible for investigating crimes that involve, among other things, the unlawful importation of illegal narcotics (21 U.S.C. §§ 952, 960 and 963), the possession with the intent to distribute controlled substances and the distribution of controlled substances (21 U.S.C. § 841), conspiracy to distribute and possess with intent to distribute controlled substances (21 U.S.C. § 846), the use of communication facilities to further these offenses (21 U.S.C. § 843(b)), as well as the laundering of monetary instruments (18 U.S.C. §§ 1956 and 1957). In conducting these investigations, I have used a variety of investigative techniques and resources in several investigations that have included physical and electronic

surveillance, the use of confidential sources and informants, and securing other relevant information using other investigative techniques. Through these investigations, my training and experience and conversations with other special agents, as well as other law enforcement personnel, I have become familiar with methods used by narcotic traffickers to safeguard their narcotics, to distribute narcotics, and to collect and launder related narcotic proceeds.

3. The information contained in this Affidavit is based upon my personal knowledge, my conversations with other law enforcement officers and individuals, and my review of investigative reports and other documents, as well as consensually recorded conversations. This Affidavit is made for the limited purpose of establishing probable cause in support of a criminal complaint against DOUGLAS GREER for a violation of Title 21, United States Code, Section 841(a)(1). Because this Affidavit is for the limited purpose of establishing probable cause, it does not contain all of the information known to me concerning this investigation.

## II. SUMMARY OF THE INVESTIGATION

### Background and Information Received from CS-1

4. In approximately the middle of August 2009, a Cooperating Source (hereinafter identified as "CS-1") provided information to DEA agents in Chicago, which led to recorded telephone conversations and a controlled narcotics transaction with GREER. CS-1 has convictions for possession of a controlled substance, manufacturing and delivery of a controlled substance conviction, and theft, in addition to arrests for controlled substance

offenses and theft. CS-1 is cooperating with the DEA in the hopes of receiving a reduced sentence with respect to a crime with which s/he was charged.

*Delivery of Cocaine*

5.  On or about August 12, 2009, from approximately a little before 6:00 p.m. to approximately 8:00 p.m., CS-1 made several nonrecorded and consensually-recorded calls to a telephone number that s/he knew for an individual hereinafter identified as Individual A, in which CS-1 negotiated with Individual A and GREER[1] for the delivery of wholesale quantities of cocaine.[2] During these consensually-recorded conversations, CS-1 spoke mostly to Individual A. In at least one of the telephone calls, GREER also spoke with CS-1. During the initial monitored but unrecorded conversation, CS-1 asked Individual A to meet up with GREER, who CS-1 knew as "Doug." Individual A told CS-1 that Individual A would find GREER. In the next recorded conversation, Individual A informed CS-1, in

---

[1] The positive identification of GREER during this investigation was accomplished through multiple techniques. CS-1 identified GREER on the telephone and later in person as "Doug." DEA agents identified GREER from a driver's license photograph. GREER also verbally identified himself upon arrest. Additionally, a Georgia driver's license with the name DOUGLAS GREER was found on his person.

[2] To the extent I refer to the contents of consensually recorded conversations in this Affidavit, the content of the conversations is based on DEA agents' monitoring of the recorded conversations and DEA agents' later review of the conversations. In parentheticals where I attribute meaning to a statement, I am basing those meanings on information received from CS-1, the contents and context of the conversations and the investigation as a whole, my experience as a law enforcement officer, and the experience of other law enforcement agents and officers in this investigation. The quotes contained in this Affidavit are preliminary, not final transcriptions of the consensually-recorded phone calls. The times listed for these conversations are approximate. The summaries below do not include all statements or topics covered during the course of the intercepted conversations.

effect, that Individual A had just "bumped" into GREER. According to CS-1, CS-1 understood that GREER generally negotiated the transactions for narcotics in person and that, by asking to meet with GREER, CS-1 was communicating to Individual A that CS-1 wanted to buy narcotics from GREER. CS-1 additionally relayed to DEA agents that CS-1 believed GREER typically sold a kilogram of cocaine for $31,500. During the recorded telephone conversations, CS-1 conveyed that s/he wanted a discount in the price of the drugs s/he planned to buy from GREER. During a telephone conversation in which GREER spoke on the telephone to CS-1, CS-1 stated to GREER, in effect, that the price "was kind of high," (which DEA agents understood to refer to the $31,500 per kilogram price). GREER and CS-1 then arranged to do the transaction that night because GREER told CS-1, in effect, that he had to "leave town tomorrow." At the conclusion of these telephone calls, CS-1 arranged to meet with Individual A and GREER in Tinley Park, Illinois.

6. After arriving in a prearranged location in Tinley Park, Illinois area, DEA agents searched CS-1 and CS-1's vehicle (hereinafter "CS vehicle") for contraband and the search was negative. DEA agents provided CS-1 with an audio recording device. CS-1 telephoned Individual A to state that s/he was there. During that consensually-recorded conversation, a new meeting place was arranged in the area of 51st Street and Cottage Grove in Chicago at a Walgreens parking lot. DEA agents and CS-1 drove from Tinley Park to a pre-arranged location before proceeding to the Walgreens parking lot. At the prearranged location, DEA agents searched CS-1 and CS vehicle for contraband and the search was

negative. DEA agents then activated the audio recording device on CS-1. DEA agents followed CS-1 to the Walgreens parking lot at 51st Street and Cottage Grove. DEA agents established surveillance at this location in anticipation of the arrival of Individual A and GREER.

7. At approximately 8:30 p.m., DEA agents observed a black Toyota enter the parking lot and pull up next to CS vehicle. CS-1 entered into the back rear passenger compartment of the Toyota. DEA agents observed that Individual A was in the driver's seat and GREER was in the front passenger seat of the Toyota. During this monitored meeting, CS-1 and Individual A and GREER discussed the price and amount of the transaction for cocaine and the next meeting location. CS-1 reported to DEA agents that CS-1 asked for five kilograms of cocaine and a discount on GREER's usual price, which CS-1 understood to be $31,500. According to CS-1, GREER agreed to sell CS-1 the five kilograms of cocaine for the discounted price of $30,500 with CS-1 paying Individual A a brokerage fee of $500 per kilogram. CS-1 informed DEA agents that GREER, Individual A, and CS-1 then arranged to meet in the area of 77th Street and Dan Ryan expressway in Chicago in about one hour. DEA agents then observed CS-1 exiting the Toyota and entering CS vehicle. DEA agents then observed the Toyota leave the parking lot.

8. At approximately 10:00 p.m., DEA agents and CS-1 drove to a prearranged location. At the prearranged location, DEA agents again searched CS-1 and CS vehicle for contraband and the search was negative. DEA agents activated CS-1 with an audio recording

device and provided CS-1 with a backpack, which would appear to contain U.S. currency reflecting the agreed purchase price of approximately $152,500. DEA agents then followed CS-1 to the second meeting location at 77th Street and Wabash Street in Chicago, near the Dan Ryan expressway, and DEA agents established surveillance at that meeting location. After arriving at the second meeting location at 77th Street and Wabash Street, CS-1 placed a telephone call to Individual A, in which CS-1's side of the conversation was recorded, informing Individual A that CS-1 had arrived at the arranged meeting location.

9. At approximately 10:25 p.m., DEA agents observed the same Toyota arrive and park across the street from CS-1's vehicle in the middle of the South 7700 block of Wabash Street. At that time, DEA agents observed CS-1 exit CS vehicle, cross the street, and enter the Toyota. CS-1 later reported to DEA agents that Individual A was in the driver's seat of the Toyota alone. In monitored conversations, CS-1 and Individual A generally questioned where GREER was until approximately 10:44 p.m. During this time period, CS-1 was observed going back and forth from the Toyota to CS-1's own car.

10. At approximately 10:44 p.m., DEA surveillance observed a black male wearing a white shirt and carrying a backpack, later identified as GREER, exiting a vehicle, which subsequently drove away, on the 7600 block of Wabash Street. DEA agents observed and video surveillance showed that GREER approached the back passenger area of the Toyota with the backpack. At this time, CS-1 was seated in the Toyota. DEA agents further observed GREER crouch down and engage in a conversation with CS-1. DEA agents next

observed CS-1 walk across the street to CS vehicle and retrieve the backpack containing what appeared to be the money for the transaction. DEA agents and video surveillance showed GREER start to walk across the street with the backpack with which he had arrived. DEA agents observed CS-1 and GREER exchange backpacks in the middle of the street. At that time, DEA agents observed Individual A leave the scene in the Toyota. CS-1 returned to CS vehicle with the backpack provided by GREER.

11. At that time, GREER was arrested and taken into custody. At the time of his arrest, GREER produced a drive's license issued by the state of Georgia bearing the name "DOUGLAS GREER." GREER also verbally identified himself as DOUGLAS GREER.

12. DEA agents recovered the backpack that GREER had handed to CS-1 from CS vehicle. In the backpack that GREER had handed to CS-1, DEA agents found what appeared, to be based on my training and experience as a law enforcement officer, seven kilogram-sized bricks of cocaine. DEA agents field-tested the bricks and the field-test was positive for cocaine. DEA agents searched CS-1 and CS vehicle for other contraband and the search was negative.

## III. CONCLUSION

13. Based on the foregoing, I respectfully submit that there is probable cause to believe that defendant DOUGLAS GREER knowingly and intentionally possessed with intent to distribute and distributed a controlled substance, namely, 5 kilograms or more of mixtures and substances containing a detectable amount of cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

Haralambos J. Kotsianis, Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to before me

on this 13th day of August, 2009

MICHAEL T. MASON
United States Magistrate Judge